# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Samsung Galaxy S6 Cellular Phone, model #SM-G920V bearing IMEI# 990004874919768 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 5:20-MJ-00402

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b)<br>18 U.S.C. §§ 922(g), 924(c) | See attached affidavit. |

The application is based on these facts:

> *See attached Affidavit*
> ☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Valerie H. Atwood, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Riverside, CA_____

Honorable Sheri Pym
*Printed name and title*

AUSA: Robert Trisotto; (213) 503-1679

## <u>AFFIDAVIT</u>

I, Valerie H. Atwood, being duly sworn, declare and state as follows:

### I.   <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a search warrant for a white Samsung Galaxy S6 Cellular Phone, model #SM-G920V bearing IMEI# 990004874919768 (the "SUBJECT DEVICE") in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in Riverside, California.  The SUBJECT DEVICE is further described in Attachment A.

2.   The requested search warrant seeks authorization to seize the items described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute); Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility to Facilitate a Drug Trafficking Offense); Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm or Ammunition); and Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) (collectively, the "SUBJECT OFFENSES").  Attachments A and B are incorporated by reference into this affidavit.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does

not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since January 2017.  As an ATF Special Agent, I have received training in federal firearms and narcotics laws and regulations.  I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program as well as the ATF Special Agent Basic Training Program.

5.  My duties include the investigation of criminal violations of federal firearms laws.  I have participated in several investigations involving individuals illegally possessing and/or trafficking in firearms.  I have also interviewed confidential informants, witnesses, cooperating defendants, criminal defendants, and other persons engaged in violations of federal firearms laws.

6.  Prior to working for the ATF, I received a Bachelor of Arts degree in Philosophy from the University of Rochester, a Master of Arts degree in Middle Eastern Studies from the University of Texas at Austin, and a Master of Arts degree in International Security.  I am currently assigned to the ATF Riverside, California Field Office.

### III.  SUMMARY OF PROBABLE CAUSE

7.    On January 26, 2018, law enforcement officers received information that defendant Lee Anthony ("defendant"), who officers were trying to locate due to outstanding felony arrest warrants, was at a Comfort Inn located in Moreno Valley, California.  Officers set up surveillance at the hotel and saw defendant walking to his car.  A search of defendant was conducted and officers found a loaded .357 Magnum revolver in his front waistband, about 39.1 grams of methamphetamine in his front pants pocket, and the SUBJECT DEVICE in his left rear pants pocket.  Additionally, defendant had on his person multiple empty plastic bags, a digital scale, approximately $1,199 in cash, and three glass pipes.

### IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    The First Superseding Indictment and Trial Date.**

9.    On August 8, 2019, a Grand Jury in the Central District of California returned a First Superseding Indictment charging defendant with 21 U.S.C § 841(a)(1), (b)(1)(B)(viii) (Possession with Intent to Distribute Methamphetamine), 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime), and 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm and Ammunition), as well as several additional counts which the Court dismissed on the government's motion following a ruling on defendant's motion to suppress

evidence.  Case No. ED CR 18-00146-FMO.  The offense conduct underlying the pending counts stem from the events of January 26, 2018, which are described in this affidavit.

10.  The case is currently set for trial on October 13, 2020 before the Honorable Fernando M. Olguin, United States District Judge, Central District of California.  Under the Court's August 6, 2020 Scheduling Order, all search warrants related to the matter must be filed by no later than August 28, 2020.  ED CR 18-000146-FMO, ECF No. 135.

**B.   The SUBJECT DEVICE was seized on January 26, 2018.**

11.  On January 26, 2018, Riverside Police Department ("RPD") officers assigned to the Multi Enforcement Tactical Response Operations ("METRO") team had information regarding the whereabouts of defendant, who currently had outstanding felony warrants for a Post Release Community Supervision ("PRCS") violation as well as for being a felon in possession of a firearm.  At the time, RPD Officer Evan Wright, among other RPD officers on the METRO team, knew defendant from a previous incident where Officer Wright arrested defendant for being a felon in possession of a firearm and for the sales of narcotics. At the time, RPD Officer Wright also knew that the defendant was currently on PRCS and was familiar with his PRCS search terms.

12.  The information that the RPD METRO team received was that defendant was currently in an unknown room at the Comfort Inn located at 23330 Sunnymead Boulevard in Moreno Valley, CA. As a result, RPD Officers set up surveillance in the parking lot of the Comfort Inn.  While conducting surveillance, RPD officers

saw a silver Acura (license plate CA-3CEB929) parked in the parking lot.  Officer Wright remembered this vehicle from the previous incident with defendant and knew that it belonged to defendant.  Officer Wright remembered the defendant's vehicle because Officer Wright located a firearm and methamphetamine hidden within the driver's side door panel.  RPD officers conducted a records check of the silver Acura and confirmed it was still registered to defendant.

13.  While conducting surveillance in the Comfort Inn parking lot, RPD officers saw a black male who they were able to identify as defendant holding a large computer printer walking towards the silver Acura.  As he was walking towards the vehicle, RPD Officers exited their vehicles and walked towards defendant.  Officer Wright gave defendant commands to which defendant complied, and was taken into custody.

14.  Officer Wright conducted a search of defendant's person.  In the defendant's front waistband was a Ruger .357 Magnum Revolver loaded with six rounds of ammunition.  Inside the defendant's left front pants pocket was a sock that contained two plastic bags, each containing methamphetamine, as well as multiple empty clear zip lock plastic bags.  Also inside the defendant's left front pants pocket was a black zipper pouch that also contained multiple empty zip lock bags as well as three glass pipes.  Inside the defendant's right front pants pocket was a white colored pouch that contained a digital scale. In the defendant's left rear pants pocket was a wallet that

contained about $1,199 in cash.  Also found in the defendant's
left rear pants pocket was the SUBJECT DEVICE.

## V.    TRAINING AND EXPERIENCE ON DRUG OFFENSES AND THE USE OF DIGITAL DEVICES

15.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as on
their cell phones and other digital devices.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   Based upon my training and experience on drug offenses, together with the facts of this case, I believe there is probable cause to believe that defendant used the SUBJECT DEVICE to communicate about the SUBJECT OFFENSES, including the sale of the methamphetamine found on his person, and that the SUBJECT DEVICE has evidence on it, such as the type detailed above, concerning the SUBJECT OFFENSES.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

15.   As used herein, the term "digital device" includes the SUBJECT DEVICE.

16.   On or about June 22, 2020, I conducted research into the make and model of the SUBJECT DEVICE.  While conducting that research and reaching out to other agents familiar with examining digital devices, I learned that the make and model of the SUBJECT DEVICE is common and there are multiple methods

available to potentially bypass a lock in order to access its contents under a search warrant issued by the Court.

17. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress defendant's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of defendant's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  20. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VII. <u>CONCLUSION</u>

21.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found on the SUBJECT DEVICE, as described in Attachment A.

_____
Valerie H. Atwood
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2020

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE") was seized on January 26, 2018, and is currently maintained in the custody of The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in Riverside, California:

1.    A white Samsung Galaxy S6 Cellular Phone, model #SM-G920V bearing IMEI# 990004874919768.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute); Title 21, United States Code, Section 843(b) (Unlawful Use of a Communication Facility to Facilitate a Drug Trafficking Offense); Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm or Ammunition); and Title 18, United States Code, Section 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) (collectively, the "SUBJECT OFFENSES"), namely:

a.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which concern the possession or distribution of narcotics, firearms or ammunition;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which concern the possession or distribution of narcotics, firearms or ammunition;

c.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

d.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

e.    Audio recordings, pictures, video recordings, or still captured images concerning the purchase, sale, transportation, or distribution of narcotics, firearms, or ammunitions;

f.    Contents of any calendar or date book for January 5, 2018 to January 26, 2018;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations for the time period of January 5, 2018 to January 26, 2018; and

h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

iii

          ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

     2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)

     3.   In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure while the SUBJECT DEVICE is not connected to the Internet or a network (such as in "Airplane Mode"):

          a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

          b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

          c.   The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed

120 days from the date of issuance of the warrant.  The
government will not search the digital device(s) beyond this
120-day period without obtaining an extension of time order from
the Court.

> d.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

> > i.   The search team may subject all of the data
contained in each SUBJECT DEVICE capable of containing any of
the items to be seized to the search protocols to determine
whether the SUBJECT DEVICE and any data thereon falls within the
scope of the items to be seized.  The search team may also
search for and attempt to recover deleted, "hidden," or
encrypted data to determine, pursuant to the search protocols,
whether the data falls within the scope of the items to be
seized.

> > ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

> > iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

> e.   If the search team, while searching a SUBJECT
DEVICE, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that

SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    During the execution of this search warrant, law enforcement is permitted to (1) depress defendant Lee Anthony's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICE (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of defendant Lee Anthony's face with his or her eyes voluntarily open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.